# United States Court of Appeals
## For the First Circuit

No. 10-2488

WENDY BALSER,

Plaintiff, Appellant,

v.

INTERNATIONAL UNION OF ELECTRONIC, ELECTRICAL,
SALARIED, MACHINE & FURNITURE WORKERS (IUE) LOCAL 201
and GENERAL ELECTRIC COMPANY,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. Magistrate Judge]

---

Before

Torruella, Lipez, and Howard,
Circuit Judges.

---

Mitchell J. Notis, with whom Law Office of Mitchell J. Notis,
was on brief for appellant.
Laura M. Raisty, with whom Keith B. Muntyan and Morgan, Brown
& Joy, was on brief for General Electric Company.
Brian J. Rogal, with whom Angoff, Goldman, Manning, Wanger,
Hynes & Dunlap, P.C., was on brief for IUE Local 201.

---

November 16, 2011

---

**TORRUELLA**, **Circuit Judge**.  Plaintiff-Appellant Wendy Balser ("Balser") appeals the district court's award of summary judgment to her employer, General Electric Company ("GE"), and her collective bargaining agent, International Union of Electronic, Electrical, Salaried, Machine & Furniture Workers Local 201 ("Local 201" or "Union"), on her allegations of wrongdoing by both companies for violations of her rights as an employee pursuant to section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.  Specifically, Balser claims that (1) GE violated the collective bargaining agreement between itself and the Union when it reclassified a position for which she was hired, resulting in her subsequent removal from that position; and (2) the Union violated its duty of fair representation in colluding with GE to reclassify her position and in refusing to take her filed grievance to arbitration.  We conclude that the district court properly granted summary judgment as to Balser's claims and affirm the district court's decision.  Balser v. IUE Local 201 & Gen. Elec. Co., No. 08-11376-LTS, 2010 WL 3927719 (D. Mass. Oct 4, 2010).

## I.  Background

### A.  Balser's Work at River Works

GE, a multinational company that does business in the Commonwealth of Massachusetts, is composed of several divisions.  One of its divisions is General Electric Aircraft Engines, which manufactures jet engines for both commercial and military use and

has a manufacturing facility, River Works, in Lynn, Massachusetts. GE hired Balser in July 2007 to work as a "Zyglo Inspector"[1] at the River Works facility; this position required her to engage in the nondestructive testing of parts to be used in the construction of aircraft engines. In preparation for this position, Balser was required to undergo approximately four hundred hours of on-the-job training, after which she became certified to perform Zyglo-related work.

Local 201 is a labor union that exclusively represents GE employees at the River Works facility. Since the start of her employment at River Works, Balser has, by virtue of her position, been a member of Local 201 and subject to the terms of a Collective Bargaining Agreement ("CBA") between GE and Local 201 that governs the basic terms and conditions of employment for all union members employed at River Works. The CBA consists of three agreements: (1) the 2007-2011 National Agreement between GE and IUE-CWA, the Industrial Division of the Communications Workers of America, AFL-CIO, CLC and its affiliated locals, which include Local 201 ("National Agreement"); (2) the 1974 Local Understanding Upgrading and Job Posting Agreement; and (3) the 1977 Supplemental Agreement's Layoff and Transfer Supplement. The third agreement,

---

[1] Balser referred to this position as "Zyglo Inspector" in her Complaint and at deposition. The position's full name is technically "Inspector Non-Destruct." For purposes of this appeal and for the sake of consistency, we adopt Balser's "Zyglo Inspector" terminology.

the Layoff and Transfer Supplement, provides that day-work employees who have been laid off "will be transferred to any equally rated or higher rated open classification in the [River Works] Plant, exclusive of upgrading, for which they are qualified considering their [River Works] Plant employment record."

## B. Balser's Layoff and the Search for Zyglo Sorters[2]

It is common practice for GE to complete "Requests for Help" when it anticipates needing additional employees in a particular field or position, whether due to increased need or in order to replace a retiring or temporarily absent employee. GE also commonly tries to fill such positions in advance of the expected vacancy.

In January 2008, GE predicted a need for two "Zyglo Sorters," a position that also involved the non-destructive testing of aircraft engine components. Zyglo Sorter positions generally were highly coveted in GE because employees were paid according to the amount of work completed and not on an hourly basis, creating the potential to earn significantly more money than other positions. For this reason, Zyglo Sorter openings typically were filled by senior employees eligible for an upgrade; however, such positions also could -- though in practice tended not to -- be

---

[2] Balser referred to this position as "Zyglo Sorter" in her Complaint and at deposition. The position's full name is technically "PW Zyglo Sorter," with "PW" meaning "piecework." For purposes of this appeal and the sake of consistency, we adopt Balser's "Zyglo Sorter" terminology.

-4-

filled by employees transferring from one job to another due to lack of work.

At that time, GE management believed two current Zyglo Sorters -- Robert Murciak ("Murciak") and John Doherty ("Doherty") -- would be retiring soon.[3] It filed two Requests for Help -- Nos. 11983A and 11984A -- on January 28, 2008, and officially posted the positions on February 12, 2008.

On approximately February 11, 2008, Balser received a "lack of work" notice informing her that she was going to be laid off because there was not sufficient work to be divided amongst the Zyglo Inspectors.[4] On February 13, 2008, Balser met with GE's

---

[3] Why GE believed these individuals would be retiring soon is not clear from the record. The record shows that neither individual retired in February 2008, nor had either submitted requests to retire as of January or February 2008.

According to Doherty's deposition, he had been thinking of retiring in 2008, but had not informed anyone of that fact. Murciak contacted Local 201 in mid-February to complain about the posting of Zyglo Sorter positions, believing there would not be sufficient work to share amongst himself and the other sorters -- hardly the actions of someone about to retire. Both individuals did, in fact, retire in 2008, with Doherty notifying GE of his intention on May 1 and retiring on June 30. Murciak retired on July 31.

[4] During her deposition, Balser testified that GE Manager for Union Relations, Richard Sampson ("Sampson"), informed her that she had been laid off, first, because there was not enough work to share amongst those in her position, and second, because the lowest seniority person -- in this instance, Balser -- is laid off when there is a lack of work. Balser conceded that there did not seem to be sufficient work to share amongst those in her position, and does not contest her layoff from the Zyglo Inspector position on appeal.

Manager for Union Relations, Richard Sampson, to discuss other jobs for which she might be qualified and which might be available to her on account of her layoff, pursuant to the CBA's Layoff and Transfer Supplement, see supra Part I.A. Sampson informed Balser of three jobs for which she might be eligible due to her layoff. One of the offered employments was the recently posted Zyglo Sorter position.[5] Sampson explained that the Zyglo Sorter position was an option for Balser, not only because of her recent layoff, but also because of her prior Zyglo certification. Sampson, understanding the job to be permanent at that time, informed Balser as such.

Balser expressed an interest in the Zyglo Sorter position and an interview was arranged with Zyglo Sorter Manager, Thomas Towey ("Towey"). Before her interview, Sampson prepared an Interview Referral Form stating that Balser was applying for Request for Help No. 11983A and that she would be replacing "Skip Doherty" in the Zyglo Sorter position. Sampson informed Balser that Doherty's name on the interview form had no actual significance, i.e., it did not affirmatively mean that she would be Doherty's replacement if she were hired.

On February 14, 2008, Balser interviewed for and was offered the Zyglo Sorter position. Balser accepted the position that same day. She was scheduled to start work on February 19,

---

[5]  The other two positions were a parts handler position and a production follower position.

2008.[6] Balser in fact did not start work until February 20, 2008, a pivotal fact that will be addressed subsequently.

## C. The Ides of February

The following events transpired between Sampson's February 13 "job opening" meeting with Balser and her February 20 "punch in" or start date.

### 1. Union Member to Casilli: Balser is a Sorter?

On or around February 13, 2008, Union Business Agent Rick Casilli ("Casilli") received a phone call from a union member expressing frustration that Balser either had been offered and/or accepted the recently posted Zyglo Sorter position. The union member, speaking on behalf of himself and other members, was upset that Balser, who at the time only had approximately seven months of service with GE, had been offered a position typically reserved for only the most senior employees. Because it is Local 201's duty to investigate how GE fills its positions -- particularly if a hiring might contradict the CBA or GE past practice -- and to process grievances if it determines that a position was not filled according to CBA procedures or GE custom, the Union decided to investigate GE's possible hiring of Balser, a lack of work employee, for the Zyglo Sorter position.[7]

---

[6] Balser was not scheduled to start work on Monday, February 18, 2008, because it was a holiday.

[7] For purposes of this opinion, the following terminology will be relevant. A "lack of work" employee is a GE employee who has been

-7-

## 2. Casilli to Sampson: Lack of Work Gets Priority Over Upgrade?

According to Casilli's deposition testimony, on receiving the February 13 call from the union member, he "[i]mmediately" contacted Sampson to investigate the possible hiring of Balser. Casilli informed Sampson as to the disgruntled rumblings from union members. Casilli asked Sampson how Balser, having only worked at the company for less than a year, could have been offered or hired for a position typically reserved for more senior-level employees. Casilli stated that Sampson told him he did not believe Balser's hire was due to upgrade -- as was generally the practice for such a seniority-preferred position -- but rather, lack of work. Casilli said he told Sampson during that conversation that "[t]his could be a big problem" because the Zyglo Sorter positions only had been posted as of February 12. Further, GE generally only posted

---

laid off from his or her employment. Casilli testified that a lack of work employee generally filled a vacant position after GE had reviewed openings in the facility and assessed whether that employee met the position's qualifications. If he or she did, "the company's obligation would be to offer . . . [the position] or give . . . [the employee a] bump in rates."

In contrast, an "upgrade" employee is an employee who has obtained a level of seniority in GE, which is calculated based on the day that an individual was hired at GE, and not according to seniority on the job. To fill a position by upgrade, Casilli testified, GE generally examined the upgrade files and reviewed "the high senior people . . . . Then they would look at the top two or three candidates. They would usually pick the top senior candidate. If they are going to skip the top senior, they have to have pretty good reason. They would call usually the top two senior people and offer them the job."

jobs it intended to fill by upgrade, and it went against company practice to post an opening for a position only to fill it on a lack of work basis.

Casilli testified that he informed Sampson he would need additional information concerning Balser's potential hiring as a Zyglo Sorter, including details about the postings, Balser's layoff, and the positions themselves, to assess whether Balser or another union member had a right to the position. Casilli stated he conferred with Sampson on Wednesday (February 13), Thursday (February 14), the following Tuesday (February 19), and the following Wednesday (February 20) regarding the matter.[8]

According to the record, Casilli met with Sampson in person on February 14, 2008 and engaged in subsequent email correspondence with him that day. During these interactions, Casilli informed Sampson that Local 201 would not support the placement of a recently-hired employee in the Zyglo Sorter position. Casilli told Sampson that he intended to file a grievance on two accounts: (1) GE had not placed lack of work employees into high paid jobs, like the Zyglo Sorter position, in over ten years; and (2) it was accepted GE practice for posted piecework positions, like the Zyglo Sorter job, to be filled by

_____

[8]  Although Sampson did not recall the specific date(s) of any communications with Casilli, he acknowledged having spoken with Casilli on at least one occasion concerning Balser's qualifications and entitlement to the position.

-9-

upgrades, and not lack of work employees. Casilli additionally advised Sampson to fill the Zyglo Sorter positions "by seniority among upgrades" and to place Balser "on a temporary IR 16[9] for [Herbert] Sutherland's position."[10]

Sampson, in turn, noted that he had advised Balser during their initial meeting of union members' discontent concerning GE's potential filling of a typically seniority-based position with a non-senior employee; that if she were hired for the Zyglo Sorter position, it might be "grieved and she might not stay;" and that despite this, Balser expressed an interest in continuing to work until informed otherwise. Casilli informed Sampson, also on February 14, that he would be "writing the Grievance tomorrow if you placed her on a 'permanent' position. If you placed her on a 'temporary position' for Sutherland and are placing [other

---

[9] "IR" is a type of employee classification under the CBA. If a position is classified with the designation "IR" or "R," it constitutes an "equally rated classification" under the CBA, to be discussed infra.

[10] Herbert Sutherland ("Sutherland") was another GE employee and Local 201 member. On or around February 7 or 8, 2008, Sutherland had been offered and accepted a Zyglo Sorter position on an upgrade basis, approximately one week before Balser's acceptance of the position. Because there was still a demand for someone in Sutherland's former position, however, he was not released from his prior position or able to immediately assume his Zyglo Sorter duties. This was in accordance with GE policy, which allows up to four weeks for an employee's release from a current job after receiving an upgrade. Sutherland did not first punch in for work as a Zyglo Sorter until March 17, 2008.

recommended senior-level employees] on [sic] other two jobs -- then you do not get the Grievance."

### 3. Murciak to Merchant: Not Retiring and Too Many Zyglo Sorters

On February 13, 2008, Murciak -- one of the Zyglo Sorters whom GE initially believed was on the verge of retiring and for whom it generated the Requests for Help at issue -- contacted Local 201 Executive Board Member Fred Merchant ("Merchant"). During this phone conversation, Murciak complained about GE's February 12 posting of the Zyglo Sorter positions because he feared it would interfere with the distribution of work among himself and the other Zyglo Sorters. Murciak's conversation with Merchant confirmed that he was not planning on retiring soon, contrary to GE's initial belief. Merchant promptly informed GE's Human Resources Manager, Matthew Scagnelli ("Scagnelli") of this information. Based on this information, GE cancelled its Request for Help No. 11984A.

### 4. Doherty to GE: Not Retiring and Ready to Be Back in the Zyglo-Sorting Game

Doherty, who had been out on sick leave since the end of January due to heart problems, provided GE with a letter from his doctor, dated February 13, 2008, stating that he would be able to return to work with no restrictions as of March 1, 2008.[11] The

---

[11] On January 31, 2008, Doherty fainted and was taken to a hospital. Doherty received a pacemaker and testified that although he felt fit to return to work by February 2, 2008, doctors required him to wait so that the "wound" or "scar" from the surgery could "heal."

specific date when Doherty informed GE of his anticipated March 1, 2008 return is not clear from the record, although Doherty testified at deposition that he believed it was likely around mid-February. Sampson subsequently informed Scagnelli that Merchant had said Doherty would be returning to work following his medical leave.

### 5. Scagnelli to Sampson: 11983A Reclassified

Sampson testified that "two or three days after" his February 13, 2008 meeting with Balser, Sampson received notification from Human Resource Manager Scagnelli that the Zyglo Sorter position 11983A had been changed from a permanent to a temporary position because the person Balser was intended to replace, Doherty, was now scheduled to return from sick leave. Sampson additionally testified that Scagnelli informed him that he had to tell Balser that, on account of 11983A's reclassification, "she could go to a different R16 position versus going to a temporary job."

### 6. Sampson to Balser: The Times They Are A-Changin'

Approximately two or three days following his February 13 meeting with Balser, Sampson stated he met with Balser to inform her that the Zyglo Sorter position, initially believed to be permanent, had been reclassified as temporary because the person she was intended to replace now was returning from sick leave; a different position (that was permanent) was available to her; she

still could accept the Zyglo Sorter position, provided that she understood it was temporary; and she also had the right to refuse that job without any penalty, given that it was a temporary position. According to Sampson, Balser stated that she wished to remain in the temporary Zyglo Sorter position. Although Balser acknowledges that she spoke with Sampson at least twice prior to her February 20 start date concerning the position, she denies that she was told of the position's reclassification before February 20.

Balser was scheduled to start work on February 19, 2008. However, she called in sick that day, fearing other employees' and union members' reactions, and did not punch in to the Zyglo Sorter position until February 20, 2008. On February 19, Balser expressed her concerns to Sampson. The parties dispute the content of that conversation.

Specifically, Sampson testified that during that conversation, he again informed Balser that GE had reclassified the Zyglo Sorter position from permanent to temporary. Although Balser asserts Sampson never informed her she was filling a temporary position and that she "always" believed it was permanent before starting work on February 20, Balser also (confusingly) testified that on February 19 she spoke with Sampson who recommended that she accept the Zyglo Sorter position as temporary. Balser also subsequently submitted a grievance form on April 2, 2008, prepared by a Union official, Gary Poland ("Poland"), in which she stated

-13-

that Sampson notified her on February 19, 2008 "that the job was no longer permanent and that it was temporary." At deposition, Balser "didn't know" why she had submitted a grievance with information that she now alleges was incorrect.

Construing the facts in Balser's favor, as we must, we accept that when she started work on February 20, 2008, Balser did not have actual knowledge as to GE's reclassification of the Zyglo Sorter position, and that, at the very least, Balser and Sampson had some form of communication concerning the position on February 19, 2008.

### 7. February 19 Email: "Illness Temporary"

On February 19, 2008, Casilli sent an email to a member of the Union's Executive Board stating that GE had informed Casilli that same day that "Balsar [sic] was an 'illness temporary' for Doherty being out on disability," but that Sutherland and another senior employee would be "permanent addition[s]." Thus, as of February 19 at the latest -- one day prior to Balser's actual punching in at work as a Zyglo Sorter -- GE officially had taken the position that Balser's position was temporary.

### 8. February 20: GE Cancels the Zyglo Sorter Positions

On February 20, 2008, Scagnelli sent an email to Sampson regarding the "Zyglo jobs." In the email, Scagnelli advised Sampson to "cancel the two zyglo jobs (they were backfills for Doherty & Murciak)," the individuals whom GE initially believed

-14-

were retiring when it posted the positions. Scagnelli additionally provided that GE would "keep Sutherland . . . once he is released [from his former position] & trained," and that GE "can let the temp zyglo woman go." The February 20 email reaffirmed GE's position that Balser's position was not viewed as a permanent one by GE.

## D. Reporting for Duty and Aftermath

Balser first reported for work as a Zyglo Sorter on February 20, 2008. On or about March 3, 2008,[12] Doherty returned from medical leave and resumed his Zyglo Sorter position. Because GE had not yet released Sutherland from his prior position, Balser was able to remain in her position after Doherty's return.

Sutherland first reported for his Zyglo Sorter position on March 17, 2008. Once Sutherland punched in for work, there were nine Zyglo Sorters, including Balser, doing the work generally done by seven or eight employees. Of the nine Zyglo Sorters, Balser -- as she herself concedes -- was the least senior.[13] Factoring in the time required for Sutherland to undergo Zyglo training, and considering that Balser was the least senior of all the Zyglo

---

[12] Doherty testified that he returned to work on March 1, 2008. Because this date was a Saturday, GE asserts that Doherty's correct start date was in fact March 3, 2008.

[13] The seniority dates of the nine Zyglo Sorters were: George Peach (January 20, 1965); Doherty (December 21, 1966); Murciak (March 20, 1967); Keith Bamford (March 18, 1968); Sutherland (September 5, 1968); Charles Gamble (May 27, 1969); William Pilote (September 2, 1969); Robert Hasan (October 28, 1971); and Balser (July 16, 2007).

-15-

Sorters, GE informed Balser that her position as a Zyglo Sorter would end on or about March 28, 2008. It is undisputed that it was company policy to lay off employees according to their seniority levels.

GE offered Balser a position as a Stock Keeper on or about April 1, 2008. Balser first reported to work as a Stock Keeper on April 7, 2008. GE rates a Stock Keeper position, R-16, and a Zyglo Sorter position, IR-16. Pursuant to the CBA's Layoff and Transfer Supplement, if an employee transfers as a day worker "to an open job with the specific intent of remaining in [her] department, [the employee] will be recalled only to previously held high rated classifications in [her] department." Further, under the CBA, "[a]ny classification with the name numerical 'IR' or 'R' designation" constitutes an "equally rated classification." Thus, if an employee moves between two equally rated classifications, she will have no recall rights to the previous position. Applying these provisions to Balser, because both the Zyglo Sorter position and Stock Keeper position were equally rated classifications under the CBA, she did not have any recall rights to the Zyglo Sorter position.

**E. The Grievance**

Following her layoff from the Zyglo Sorter position, Balser decided to file a grievance. She turned to Union official Poland for assistance. Poland requested that Balser provide him

with information confirming that the position from which she had been laid off had been an open, permanent position. Balser was unable to provide any hard copy evidence confirming that her position had been permanent. Instead, Balser discussed her initial meeting with Sampson, in which he had stated he believed the position would be permanent; provided a copy of the documents she brought to her interview with Towey, which had Doherty's name on them as the individual she was scheduled to replace; asked Poland to look into a paper that she had misplaced and "to look up the job code and match it against the paperwork that [Sampson] gave [Balser] to bring to [Towey] to see that the coding was the same to show it was an open job;" and asserted that Sutherland had been hired for the Zyglo Sorter position after her, confirming she was entitled to the position.

On April 21, 2008, Poland submitted a grievance on behalf of Balser. The grievance stated that GE "had no right to change [Balser's Zyglo Sorter position] to temporary status for their [sic] convenience." Balser reviewed and approved the grievance before its submission to Local 201, even though Balser presently disputes some of the information contained in the grievance -- specifically, that Sampson informed her the Zyglo Sorter position would no longer be permanent.

The Union reviewed Balser's grievance and investigated her claim. It determined, first, that Sutherland was the

-17-

successful bidder on an upgrade for a Zyglo piecework position that was awarded to him in January 2008, before Balser was laid off from her prior position; second, Sutherland was not released earlier to the Zyglo piecework position because of departmental needs associated with his prior position; and third, the CBA permits GE to hold an employee in a previous position up to thirty days. The Union informed Balser of its findings and requested additional evidence supporting her claim. On receiving no additional evidence, Local 201 decided not to proceed to arbitration because it did not have sufficient evidence to support Balser's claim that the contested position was permanent. The Union made this determination on or about May 28, 2008.

## F. Seeking Zyglo Sorter Justice

On August 12, 2008, Balser filed a Complaint in the District Court for the District of Massachusetts against GE and Local 201. Balser asserted two counts in her Complaint. First, she argued that Local 201, her collective bargaining representative, had breached its duty of fair representation owed to her as a union member. Second, she contended that GE breached the terms of the CBA between GE and Local 201. GE and Local 201 filed Motions for Summary Judgment on May 17, 2010. The district court heard arguments on the motions on October 1, 2010.[14] On

---

[14] On May 15, 2009, with the parties' consent, the case was assigned to a magistrate judge for final disposition.

-18-

October 4, 2010, the district court entered an order granting GE and Local 201's Motions for Summary Judgment in their entirety because Balser could not show that GE's reclassification of the Zyglo Sorter position constituted a violation of the CBA by GE. Balser, 2010 WL 3927719, at *3-6.

## II. Discussion

### A. Standard of Review

Summary judgment is properly granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review the district court's grant of summary judgment de novo, "drawing all reasonable inferences in favor of the non-moving party while ignoring 'conclusory allegations, improbable inferences, and unsupported speculation.'" Sutliffe v. Epping Sch. Dist., 584 F.3d 314, 325 (1st Cir. 2009) (quoting Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009)). To defeat a motion for summary judgment, the non-movant "must tender 'significant probative evidence' . . . . Brash conjecture, coupled with earnest hope that something concrete will eventually materialize, is insufficient to block summary judgment." Dow v. United Bhd. of Carpenters & Joiners of Am., 1 F.3d 56, 58 (1st Cir. 1993) (quoting First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 290 (1968)).

Here, we are confronted with a hybrid claim pursuant to Section 301 of the LMRA, 29 U.S.C. § 185, that consists of two "inextricably interdependent" causes of action, i.e., Balser alleges violations of her rights by both her employer, GE, and her union, Local 201. DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 164 (1983) (quoting United Parcel Serv., Inc. v. Mitchell, 451 U.S. 56, 66 (1981)); see also Fant v. New Eng. Power Serv., 239 F.3d 8, 14 (1st Cir. 2001) ("Hybrid claims involve alleged wrongdoing on the part of both the employer and the union with respect to the rights of employees."). To prevail, the plaintiff "must prove both that the employer broke the [CBA] and that the union breached its duty of fair representation, in order to recover against either [entity]." Chaparro-Febus v. Int'l Longshoremen Ass'n, Local 1575, 983 F.2d 325, 330 (1st Cir. 1992); Fant, 239 F.3d at 14 (noting that "the court must resolve whether the union failed in fairly representing the employee and whether the employer acted in violation of the CBA terms") (emphasis added).

Thus, in this case, Balser bears the burden of showing that (1) GE's reclassification of the Zyglo Sorter position from permanent to temporary, prior to Balser's assumption of the position's duties, violated the CBA; and (2) the Union's actions constituted a breach of its duty of fair representation. DelCostello, 462 U.S. at 165 ("The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the

-20-

same whether he sues one, the other, or both."). If Balser cannot firmly plant each cause of action's foot on legally and factually-supported ground, her hybrid claim will topple. See Goulet v. New Penn Motor Exp., Inc., 512 F.3d 34, 43 (1st Cir. 2008); Laurin v. The Providence Hosp., 150 F.3d 52, 61 (1st Cir. 1998) (stating that "[f]ailure to establish either prong is fatal to [a plaintiff's] 'hybrid' claim").

**B. From Permanent to Temporary: Did GE's Reclassification Violate the CBA?**

Balser's essential argument is that her employer's exercise of discretion in reclassifying her position at the allegedly improper and bad faith request of Local 201 constituted a violation of her rights under the CBA. Balser's first step is to show that GE's reclassification of the Zyglo Sorter position contravened the CBA. See Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 20 (1st Cir. 2003). For the following reasons, Balser's claim fails.

It is undisputed that the CBA between Local 201 and GE governs Balser's employment at River Works. The CBA specifically provides in Paragraph (b) of Article XXIX of the National Agreement:

> Subject only to any limitations stated in this Agreement, or any other agreement between the Company and the Union or a Local, the Union and the Locals recognize that <u>the Company retains the exclusive right to manage its business, including (but not limited to) the right to determine the methods and means by</u>

> which its operations are to be carried on, to direct the work force, and to conduct its operations in a safe and effective manner.

(Emphasis added).

Thus, under the express terms of the CBA, GE has the "exclusive right" to determine how it will manage all operations of the company, including its "direct[ion of] the work force." Stated differently, the CBA imposes no restrictions on GE's right to assess staffing needs for positions at the River Works facility at any time, either before or after an employee has punched in to his or her position. Sworn statements of several GE management officials and Local 201 officials further affirm the significance and mutual company understanding of this provision of the CBA.

Specifically, both GE Human Resources Manager Scagnelli and GE Union Relations Manager Justin Warskinskey ("Warskinskey") stated that if GE learns before an employee punches in that a position originally posted as permanent might result in "increased headcount unsupported by the available work," GE may "cancel the position altogether or change the position from permanent to temporary, provided that it does so before an employee selected for the opening punches in." Similarly, if GE determines that there is not sufficient work to distribute amongst the staffed employees after an employee punches in, GE has the right to conduct layoffs

-22-

pursuant to the Layoff and Transfer Supplement of the CBA.[15] GE Manager of Union Relations Sampson testified that, pursuant to the CBA, GE has the "exclusive right" to determine the number of employees in a given position; to fill a position after an employee's retirement; and to change a position from permanent to temporary, even after a position has been posted.

Local 201 further affirms GE's interpretation of the governing agreement between itself and the Union. Local 201 Business Agent Casilli stated that "GE has the right to determine the number of employees in a position," and that GE does "not violate the CBA by cancelling positions," whether before (by reclassifying or cancelling the position) or after (by conducting a layoff) an employee has punched into the position.

GE and the Union, on showing "an absence of evidence to support the nonmoving party's case," Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986), have swung the evidentiary pendulum back towards Balser for her to show a genuine issue of material fact pursuant to Fed. R. Civ. P. 56. Balser falters in her burden.

Balser does not "point to 'competent evidence'" or "specific facts" to counter GE or the Union's interpretation of the CBA. Wilson v. Moulison No. Corp., 639 F.3d 1, 6 (1st Cir. 2011)

---

[15] This is, in fact, what GE did as to Balser. On determining that there were too many Zyglo Sorters (nine) to do the work typically done by only seven or eight employees, GE decided to end Balser's temporary position, as she was the least senior Zyglo Sorter amongst those employees. Balser does not contest this point.

-23-

(quoting Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011)) (internal quotation marks omitted).  Instead, Balser invites the Court to engage in the dangerous game of considering "conclusory allegations, improbable inferences, . . . or rank speculation," a game from which we always abstain.  Id.  Specifically, Balser asserts the following arguments to "deflect the swing of the summary judgment scythe."  Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010) (quoting Mulvihill, 335 F.3d at 19) (internal quotation mark omitted).

### 1.  Creation of Doherty "Fiction" Violated CBA

Balser asserts GE and Local 201 colluded to create the "pure fiction" that she had been hired as a temporary injury replacement for Doherty, and such collusion was in violation of the CBA.  Balser points to no evidence in the record, however, undermining GE's assertion that when the company initially posted for the Zyglo Sorter positions, it did so in the belief that Doherty and Murciak would be retiring soon.

GE first sent out its Requests for Help to fill the Zyglo Sorter positions on January 28, 2008; Doherty was not out on sick leave until January 31, 2008.  The fact that Doherty subsequently was absent due to sickness -- creating an immediate and actual Zyglo Sorter vacancy that quickly needed to be filled -- does not change the evidence (unrebutted by Balser) showing that when GE first recorded the anticipated vacancies, it did so in the

-24-

understanding that these respective individuals would be retiring soon. In fact, the record reflects that it was accepted practice for GE to file Requests for Help in advance of an anticipated vacancy to ensure the filling of a position before an employee's absence. While the record does not clearly show why GE at first anticipated such individuals' retirement, "[o]ur role is not to second-guess the business decisions of an employer." Rossy v. Roche Prods., Inc., 880 F.2d 621, 625 (1st Cir. 1989). The evidence shows that on receiving information from both Murciak and Doherty that neither had immediate plans to retire, GE promptly reevaluated its needs for Zyglo Sorters and acted accordingly.

Specifically, Murciak informed Merchant on February 13, 2008, of his intention to remain in the Zyglo Sorter position. Doherty received a doctor's note on February 13, 2008 and informed GE "by mid-February" of his intent to return to work as of early March. Both of these communications occurred mere days after GE had officially posted the Zyglo Sorter openings (February 12, 2008). Sampson testified that "two or three days" after his February 13 meeting with Balser -- during which he first offered the Zyglo Sorter position -- he received notification from Human Resource Manager Scagnelli that the 11983A Zyglo Sorter position which had been offered to Balser needed to be reclassified from permanent to temporary as the individual for whom she was to serve as a replacement now would be returning to work.

-25-

Balser's unsupported allegations that GE and Local 201 conspired to reclassify her position by subsequently creating the fiction of her serving as a temporary illness replacement for Doherty are insufficient to counter the record's showing of GE's objective reassessment of company staffing needs following a change in employee information. Indeed, Balser points to no testimony, email or letter correspondence, internal memoranda, or other documentation or communication supporting her contention that the Union and GE improperly schemed to reclassify; rather, the evidence shows that on learning of Doherty's subsequent and unpredicted absence -- despite learning of his non-retirement plans -- GE reevaluated its staffing needs in the Zyglo Sorter field.

At most, Balser points to the fact that the initial documentation she received on or around February 13 when applying for the position provided that she would be replacing Doherty. However, the evidence shows that Balser herself conceded -- at both deposition and in her Statement of Undisputed Facts -- that Sampson expressly informed her that Doherty's name on her employment documents "[did] not mean that [was] the person [she ultimately would be] replacing," and that Sampson had "given upgrades with other people's names on the paperwork [before], <u>but that doesn't mean that [was] who [she would be] replacing on the job</u>." Additionally, Balser stated that at the time of her Zyglo Sorter interview, she was not under the impression that she was replacing

anyone specifically.[16]  Thus, given that Balser knew before her formal offer and acceptance of the Zyglo Sorter position that Doherty's name on the form did not affirmatively establish that he was the individual whom GE explicitly intended for her to replace cuts in favor of GE's practice of continually monitoring staffing needs -- even after job postings -- and not towards a GE-Union conspiracy to justify reclassification.

### 2. GE Exercised Discretion to Enable the Union to Deprive Balser of the Zyglo Sorter Position

Balser argues that GE's exercise of discretion, which she asserts was for the sole and improper purpose of allowing the Union to deprive her of the Zyglo Sorter position, violated her rights under the CBA.  Balser points to no provision in the CBA that supports her assertion that GE's exercise of discretion in (1) reclassifying the Zyglo Sorter position on acquiring updated information concerning staffing needs in that department; (2) weighing the Union's view that hiring Balser for that position would contradict GE practice and/or CBA procedures; and (3)

---

[16]  At deposition, Balser responded as follows:

> Q:   What did Mr. Sampson say about other people being out?
> A:   He has given upgrades with other people's names on the paperwork, but that doesn't mean that is who you are replacing on the job.
> Q:   <u>You understood that [the paperwork for the Zyglo Sorter position] was supposedly to replace someone?</u>
> A:   <u>No.</u>

App. at 377 (emphasis added).

-27-

considering the Union's advisement that hiring a lack of work employee for a typically upgrade-based position would create conflict among more senior-level employees, constituted a violation of the CBA.

Balser references the following provisions to support her contention that GE's reclassification violated the CBA: (1) Art. IV, section 2, providing that the Union shall not intimidate or coerce an employee; (2) Art. XXIX, section (a), providing that GE acknowledges the Union's obligation to fairly and effectively represent its employees; (3) Art. XXVIII, section 1, providing that GE will, "to the extent practical, give first consideration for job openings and upgrading to present employees" with the necessary qualifications; and (4) Art. 1(C) of the Layoff and Transfer Supplement, providing that "[a]ffected daywork employees will be transferred to any equally rated or higher rated open classification . . ., exclusive of upgrading, for which they are qualified" considering their employment record.

None of these provisions expressly or implicitly restricts GE's "exclusive right" to consider workforce requirements and, if necessary, to reclassify a position from temporary to permanent, or vice versa, when information concerning staffing needs has changed. Articles IV and XXIX specifically address the Union's obligations to GE employees, and are more applicable to Balser's second argument concerning the Union's duty of fair

-28-

representation; the latter Articles acknowledge GE's right to consider an employee's qualifications and overall employment record when transferring or filling a position. Although Balser tries to bolster her argument that she was eligible for and thus entitled to the Zyglo Sorter position -- effectively preventing, as she asserts, GE's reclassification of the position -- by citing to Article 1(C) of the Layoff and Transfer Supplement, the issue is not whether Balser met the position's requirements (on which we pass no judgment), but simply, whether GE had the right to reassess its staffing needs for the position and subsequently reclassify it before Balser first punched in. The CBA's granting of the "exclusive" right to manage the work force to GE affirms that it did.

Given that Balser carries the compass to direct us towards material in the record showing that GE's discretionary acts -- conducted pursuant to GE's "exclusive right" to manage the work force under the CBA -- in fact violated the CBA, her inability to point us to any supporting evidence effectively leaves us on a ship without its captain steering towards summary judgment shores.

### 3. GE's Underlying Reasons for Reclassification Were Pretextual

Balser contends that GE's reasons for reclassifying, and thereby effectively removing her from,[17] the Zyglo Sorter position

---

[17] When the permanent Zyglo Sorters assumed their positions (including Sutherland and Doherty), Balser was a temporary

are nothing more than a specious excuse to favor more senior employees for a position to which she alleges she was entitled. Specifically, Balser asserts that GE's consideration of the Union's ardent objections to Balser's being hired on a permanent basis was both pretextual and a violation of the CBA.[18] Balser points to nothing in the record -- nor any legal authority -- establishing that GE's consideration of the Union's investigation of GE's hiring practices and its views on how GE filled the Zyglo Sorter position constitute a violation of the CBA. Indeed, the record reflects the contrary.

The evidence of record demonstrates that the Union had both the right and obligation to assess whether positions were filled in accordance with GE practice or CBA provisions, and notably, Balser has adduced no evidence indicating that Local 201 lacked authority to review how GE filled a position. Here, on receiving updated information concerning the Zyglo Sorter vacancies and complaints from union members as to how GE was filling those openings, the Union took immediate action.

---

employee, and also the least senior of the Zyglo Sorters, thus making her subject to layoff. She additionally had no recall rights to the Zyglo Sorter position because she had moved to a position with an equally rated classification.

[18] The only pretext that Balser asserts is GE's alleged motive to pacify the Union's objections to Balser's being hired for a lucrative piecework position typically reserved for more senior employees.

Union Business Agent Casilli and Executive/Grievance Board member Merchant looked into the Zyglo Sorter postings, with Casilli directly contacting GE's Manager of Union Relations Sampson to obtain all available information and details concerning the postings, Balser's layoff, and the vacancies themselves. On reviewing the acquired information -- including that Balser only had been employed at GE for seven months; that it was general company practice to hire more senior-level employees on an upgrade basis for the lucrative piecework positions; that GE had not filled a higher paying job, like the Zyglo Sorter position, with lack of work employees in over a decade; that Balser obtained the position due to her lack of work (and not upgrade) status; and that the postings were due to anticipated retirement vacancies that in fact were inaccurate -- Local 201 strongly urged GE to reclassify the Zyglo Sorter position from permanent to temporary. GE, taking all of these relevant factors into consideration, elected to reclassify the position, as it was entitled to do pursuant to its exclusive, discretionary rights under the CBA.

Viewing the facts in the light most favorable to Balser, as we must, even if we were to agree that GE's reasons for reclassifying the position likely were motivated by favoritism towards more senior employees and Union pressure, such motivations do not show a violation of the CBA. At most, they show the backstage politicking that likely occurs in many bureaucratically

governed relations between a company and its union, which is not prohibited by case law nor the underlying CBA at issue.

Indeed, our labyrinthian review of the record returns us to the same central point as the district court: because GE unquestionably had the right under the CBA to reassess staffing needs (either before or after a position had been filled), and either to reclassify a position before an employee punched in, or to conduct layoffs after an employee had started her position, the true issue is one of timing. The record clearly shows that GE reclassified Balser's position from permanent to temporary; thus, the determinative question is whether GE reclassified the Zyglo Sorter position before Balser officially had started as a Zyglo Sorter, or whether it reclassified her position after her rights in the position had vested.[19]

The evidence shows that although Balser was scheduled to start work as a Zyglo Sorter on February 19, she did not first punch into work until February 20. Both GE and Local 201 members' testimony and internal correspondence confirm that as of February 19, at the latest, GE had reclassified Balser's 11983A Zyglo Sorter position from permanent to temporary. Although Balser argues that her rights in the Zyglo Sorter position vested before

---

[19] Significantly, Balser conceded at her deposition that she was aware of no provision in the CBA that prevented GE from reclassifying her position before she first punched in as a Zyglo Sorter. Balser does not argue differently on appeal.

-32-

her February 20 start date -- specifically, when she first orally accepted the position on February 14 -- her contention cannot drown out the sirenic call of the evidentiary record, which confirms that (1) an employee's rights in a GE position do not vest until he or she has officially punched in to the position, and (2) GE may change a position from permanent to temporary, provided that it does so before an employee has punched in.

Because Balser does not contest her February 20 "punch in" date, nor offer evidence contradicting GE and Local 201 testimony and internal correspondence showing that her Zyglo Sorter position was reclassified as of, at the latest, February 19, we find no genuine issue of material fact as to whether GE's pre-start date reclassification violated the CBA.

## C.  Union's Duty of Fair Representation

Balser cannot firmly plant one foot of her hybrid claim in legally and factually-supported ground, and under the law, her remaining arguments cannot stand on the remaining foot of her amputated hybrid action.  Because Balser has failed to offer evidence showing that GE breached the CBA when it reclassified Balser's Zyglo Sorter position from permanent to temporary before her actual start date, Balser's now monopod claim against the Union likewise fails.  See Mulvihill, 335 F.3d at 27 ("Our conclusion that [defendant] did not breach the CBA when it terminated [plaintiff's] employment serves to dispose of [plaintiff's] case

-33-

against the Union as well."); <u>Laurin</u>, 150 F.3d at 62 (holding that because plaintiff did not show defendant's violation of the CBA, her "hybrid" claim accordingly failed); <u>see also</u> <u>DelCostello</u>, 462 U.S. at 165 (stating that a plaintiff must show an employer's violation of the CBA to prevail against either defendant in a hybrid section 301 action).  Balser having no argumentative leg left on which to stand, we hold that the district court properly granted summary judgment as to her hybrid claim.

### III.  <u>Conclusion</u>

For these reasons, we affirm the district court's grant of summary judgment.

**<u>Affirmed</u>**.