# United States Court of Appeals
## For the First Circuit

No. 22-1499

UNIVERSAL TRADING & INVESTMENT CO., INC.,

Plaintiff, Appellant,

FOUNDATION HONESTY INTERNATIONAL, INC.,

Plaintiff,

v.

BUREAU FOR REPRESENTING UKRAINIAN INTERESTS IN INTERNATIONAL
AND FOREIGN COURTS; UKRAINIAN PROSECUTOR GENERAL'S OFFICE;
UKRAINE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Barron, Chief Judge,
Howard and Montecalvo, Circuit Judges.

Stephen F. Reardon, with whom Law Office of Stephen F. Reardon
was on brief, for appellant.
Robert M. Shaw, with whom Ralph T. Lepore, III, and Holland
& Knight LLP were on brief, for appellees.

November 27, 2023

**MONTECALVO, <u>Circuit Judge</u>.**  This case of international dimensions returns to us for the second time.

In the 1990s, Cube, Ltd. ("Cube"), a Ukrainian company, which later was reorganized to become United Energy Systems of Ukraine ("UESU"), hired Universal Trading & Investment Company, Inc. ("UTICo") to help it recover lost assets.  Through the intervention of Pavlo Lazarenko, the former Prime Minister of Ukraine, UESU had been awarded a lucrative government contract.  But the proceeds of the contract were going missing; someone was diverting the assets.  In connection with UTICo's work to help Cube and UESU recover the converted assets, UTICo discovered that Lazarenko was using Cube and UESU to siphon money into his personal offshore accounts.  UTICo contacted the Ukrainian Prosecutor General's Office ("UPGO") and other Ukrainian agencies to report the fraudulent relationship.

Based on UTICo's helpful sharing of information, UPGO enlisted UTICo to assist it in tracing and recovering assets that Lazarenko and his accomplice, Petro Kiritchenko, allegedly had stolen from Ukraine.  UPGO agreed to provide UTICo a 12% commission on certain assets "returned to Ukraine, in connection with" the agreement.  Approximately $15 million of the siphoned assets finally have been returned to Ukraine.[1]

_____

[1]    Unless expressly noted otherwise, the financial figures in this opinion refer to U.S. dollars.

In the instant case, UTICo has sued Ukraine, UPGO, and the Bureau for Representing Ukrainian Interests in International and Foreign Courts (the "Bureau") (collectively, the "Ukrainian defendants"), claiming that it has helped block and freeze assets all over the world and is owed a commission for its work. We previously affirmed the district court's exercise of jurisdiction over UTICo's breach-of-contract claim, finding that the Ukrainian defendants' transactions with UTICo were exempt from immunity under the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. § 1604. Universal Trading & Inv. Co. v. Bureau for Representing Ukrainian Ints. in Int'l & Foreign Cts. ("UTICo II"), 727 F.3d 10, 12 (1st Cir. 2013).

Following our resolution of the appeal, the parties engaged in discovery and additional motion practice before the district court. In analyzing UTICo's breach-of-contract claim, the district court construed each asset recovery and failure to pay a commission as a separate claim for breach of contract. Universal Trading & Inv. Co., Inc. v. Bureau for Representing Ukrainian Ints. in Int'l & Foreign Cts. ("UTICo III"), 605 F. Supp. 3d 273, 291 n.11 (D. Mass. 2022). It ultimately dismissed all the breach-of-contract claims because some were not ripe, others were barred by the statute of limitations, and the single remaining claim failed on the merits. See id. at 290-99. The district court

- 4 -

also denied UTICo's motions to amend the complaint and several of UTICo's discovery-related requests.  See id. at 286-88.

UTICo now appeals each of those decisions, arguing that its breach-of-contract claims should survive summary judgment, that it should be allowed to amend the complaint, and that it should be permitted to conduct additional discovery.  Finding no error in the district court's opinion, we affirm.

## I. Background

## A. Factual Background

We assume the parties' familiarity with the factual context of this case and focus our recitation of the facts on those relevant to the instant appeal.  Because the primary issue on appeal is the district court's entry of summary judgment in favor of the Ukrainian defendants on UTICo's breach-of-contract claims, we take the facts in the light most favorable to UTICo and draw all reasonable inferences therefrom in UTICo's favor.  See Pleasantdale Condos., LLC v. Wakefield, 37 F.4th 728, 730 (1st Cir. 2022).

## 1. The Contractual Arrangement

UTICo is a Massachusetts corporation that offers international asset recovery services.  After UTICo informed UPGO and other Ukrainian agencies of its discovery that Lazarenko, then the First Deputy Prime Minister and eventually the Prime Minister of Ukraine, was stealing money owed to the Ukrainian government,

UPGO hired UTICo to assist it in recovering assets related to UESU and its parent company, United Energy International, Ltd.

On May 15, 1998, UTICo and UPGO reached their first agreement (the "May 1998 Agreement"). That agreement stated: "Taking into account information and assistance that [UTICo] is providing[,] . . . [UPGO] has agreed that [UTICo] will be attributed a commission of 12 (twelve) percent on all and any above assets to be returned to Ukraine, in connection with the Power of Attorney" that was executed alongside the May 1998 Agreement. The May 1998 Agreement further clarified that renumeration could not be paid from the State budget of Ukraine; instead, it was payable only "from the assets to be repatriated to Ukraine from outside of Ukraine."

In the months and years that followed, UPGO executed additional agreements relating to the May 1998 Agreement and granted UTICo powers of attorney to pursue various asset investigations across the globe. The additional powers of attorney contemplated work in the United States, the British Virgin Islands, Guernsey, the Bahamas, Panama, and other countries. But none of the powers of attorney contemplated work in Switzerland.

While UTICo performed work for UPGO, UPGO twice confirmed the validity of the contractual arrangement. Specifically, on October 2, 1998, UPGO sent a letter to George Lambert, UTICo's President, "certify[ing] the previously agreed

terms in regard to the unlawful assets outside of Ukraine." And almost a year later, in August 1999, Nikolai Obikhod, then the Deputy Prosecutor General of Ukraine, wrote to Lambert, recognizing "the work accomplished by, and the assistance from, [UTICo]" in tracing assets and affirming that UTICo was entitled to "12% of all funds returned to Ukraine from outside of its borders with the assistance of UTICo."

### 2. Investigation and Blocking of Assets

#### i. UTICo Investigation

No one disputes that UTICo was instrumental in helping the Ukrainian defendants investigate and freeze millions of dollars in assets around the world that had been expatriated from Ukraine.

Some of that assistance was provided prior to the execution of the May 1998 Agreement. For example, in October 1997, UTICo shared several documents with UPGO concerning UESU and Somolli Enterprises Ltd. ("Somolli"), an offshore entity through

which UESU diverted funds.[2]  And during an April 1998 meeting between Obikhod and UTICo to negotiate the May 1998 Agreement, UTICo disclosed to UPGO that (1) UESU's assets were controlled by Bassington Ltd. ("Bassington"), an offshore entity incorporated in the British Virgin Islands, and (2) UTICo had additional evidence tracing the diversion of UESU assets.  Through its work, UTICo dissected a four-tier subsidiary scheme and traced ownership of UESU and its parent company back to Bassington.

UTICo obtained and shared evidence with the Ukrainian defendants after the May 1998 Agreement went into effect as well. Pursuant to the numerous powers of attorney executed in connection with the May 1998 Agreement, UTICo gathered evidence from across the globe, obtaining additional information about Bassington and other entities involved in Lazarenko's money-laundering scheme, such as Bainfield Co. ("Bainfield"); Orphin S.A. ("Orphin"); Wilnorth, Inc. ("Wilnorth"); and GHP, Corp. ("GHP").

---

[2]  UTICo's involvement in Ukrainian recovery projects began in July 1993 when Cube hired UTICo to trace lost assets.  At the time, Cube had a contract with Ukraine that required Cube to deliver ferrous metals to China.  But Cube lost roughly half the value of the first delivery of the metals.  The converted funds had passed through Indian intermediaries.  UTICo traced the assets and was able to recover $660,000 for Cube.  Cube asked UTICo to direct the recovered $660,000 to an account held in the name of Somolli.  As UTICo continued to perform work for Cube and then UESU and learned about Lazarenko's involvement in the organizations, UTICo developed suspicions that Cube did not report the $660,000 recovery to Ukraine.  Based on its suspicions, UTICo promptly transferred evidence about the transaction and Somolli to UPGO and other Ukrainian agencies.

UTICo performed much of its work abroad in places like the British Virgin Islands and Panama. But it also performed, or at least attempted to perform, extensive work for the Ukrainian defendants in the United States. Specifically, in 1999, UTICo learned that Lazarenko and Kiritchenko had used expatriated assets to purchase real estate in California and instigated proceedings in the United States District Court for the Northern District of California to recover the real estate. On April 13, 1999, acting as amicus curiae for UTICo, UPGO sent a letter to the Northern District of California, which purportedly assigned UPGO's claims to the real estate to UTICo (the "1999 California Assignment"). In the letter, UPGO explained to the court that (1) Kiritchenko was facing prosecution in Ukraine, (2) Kiritchenko purchased the California properties with expatriated assets, and (3) UPGO supported UTICo's lawsuit to attach all Kiritchenko's realty in the United States, which was acquired with the laundered funds. UPGO also gave UTICo power of attorney to pursue the assets of Lazarenko, Kiritchenko, and their co-conspirators in the United States.

Despite UPGO's letter, a dispute over UTICo's standing to sue on UPGO's behalf ensued. The district court ultimately concluded that UTICo did not have standing because the purported assignment of Ukraine's claims to UTICo was invalid and the various powers of attorney were not equivalent to an assignment of

ownership.  Universal Trading & Inv. Co. v. Kiritchenko, No. C-99-3073 MMC, 2007 WL 2669841, at *20-21 (N.D. Cal. Sept. 7, 2007).  The Ninth Circuit affirmed.  Universal Trading & Inv. Co. v. Kiritchenko, 346 F. App'x 232 (9th Cir. 2009).  Accordingly, UTICo was unable to recover the U.S. properties.

In addition to the evidence regarding activities in the United States, UTICo also recovered evidence of Kiritchenko's and Lazarenko's activities in Switzerland.  None of the powers of attorney between UPGO and UTICo specifically contemplated UTICo performing work in Switzerland.  But through the course of UTICo's investigations, it developed evidence that Kiritchenko and Lazarenko held assets at various Swiss banks, including Credit Suisse, SCS Alliance, and Banque Populaire Suisse.

### ii. Swiss Investigation

UTICo was not the only group to investigate Lazarenko and Kiritchenko's international money-laundering scheme.  Prior to the execution of the May 1998 Agreement, the Swiss and Ukrainian governments also had been in communication, and the Swiss government launched its own investigation.

Starting in January 1998, UPGO sent letters rogatory to the Swiss authorities, seeking assistance in investigating Kiritchenko and his co-conspirators.  In a supplementary request dated February 14, 1998, UPGO indicated that Kiritchenko was suspected of money laundering and that Kiritchenko was the

- 10 -

beneficiary of GHP -- an entity implicated in the laundering scheme. In response, on March 6, 1998, Switzerland opened a criminal investigation to determine whether money laundering or other financial crimes had been committed in Geneva.

In connection with the Swiss investigation, a Swiss investigating judge ordered the seizure of documents concerning bank accounts opened in Kiritchenko's name and started freezing those accounts' assets. A June 25, 1999 opinion by the Swiss Federal Tribunal (the "June 1999 decision") details the Swiss investigating judge's inquiry and the contents of UPGO's January and February 1998 letters rogatory.

According to the June 1999 decision, in mid-March 1998, the Swiss investigating judge ordered SCS Alliance to supply all documents concerning GHP's bank account and other accounts opened in Kiritchenko's name, as well as the names of the other suspected individuals. On March 27 and April 1, 1998, SCS Alliance responded with information about bank accounts opened in Kiritchenko's name as well as a bank account opened in the name of a family member. The bank also supplied information about accounts held in the following entities' names: Bainfield; Wilnorth; GHP; Brancross Ltd. of Antigua ("Brancross"); European Federal Credit Bank Ltd. ("European Federal"); and Zeneta Foundation of Vaduz ("Zeneta"). Thus, the Swiss authorities got tipped off to Lazarenko's and

Kiritchenko's involvement in these entities before UPGO and UTICo executed their May 1998 Agreement.

Around the same time, the Swiss investigating judge met with an investigating judge from Kiev, Ukraine. At a March 27, 1998 meeting between the judges, the Swiss investigating judge provided the Ukrainian investigating judge with references to the offshore companies that had accounts at SCS Alliance. The Swiss investigating judge specifically highlighted accounts for which Kiritchenko appeared to be a beneficiary that Ukraine had not mentioned in its prior letters rogatory -- that is, Brancross, Wilnorth, European Federal, Zeneta, and Bainfield.

In April 1998, UPGO continued to supplement its earlier letters rogatory. Those letters provided a range of additional information, including (1) details on a contract whose proceeds allegedly were paid into Bainfield's Swiss account, (2) an explanation of Lazarenko's suspected involvement in the money-laundering scheme, and (3) identification of other bank accounts at SCS Alliance and Credit Suisse allegedly implicated in the scheme. And so, the Swiss investigating judge continued to request information and seize accounts held in Kiritchenko's and Lazarenko's names, as well as accounts opened by the companies implicated in the laundering scheme, at Credit Suisse and SCS Alliance.

All told, <u>before</u> May 15, 1998 -- the date on which UTICo and UPGO entered their first agreement -- the Swiss investigating judge had received information on and ordered the seizure of the following accounts at SCS Alliance:

- 5317, held by Kiritchenko;

- 5383, held by Bainfield;

- 5451, held by Wilnorth;

- 5452, held by GHP;

- 5482, held by Brancross;

- 5484, held by Izabella Kiritchenko;

- 5491, held by European Federal; and

- 5522, held by Zeneta.

And at Credit Suisse, the Swiss investigating judge had received information on and ordered the seizure of the following accounts:

- 875.709.72, held by Paddox Industries Ltd. ("Paddox");

- 823.896.2, held by GHP; and

- 562.927.6, held by European Federal.

### iii. Swiss Judgments

The proceedings in Switzerland ultimately led to two judgments -- one against Lazarenko and the other against Kiritchenko.

On June 28, 2000, the Court of Police in Geneva found Lazarenko guilty of money laundering and ordered him to pay nearly 10.7 million Swiss francs to Geneva (the "June 2000 Swiss court judgment"). Although the judgment required Lazarenko to pay Geneva, Switzerland ultimately transferred most of the funds to Ukraine.

About two months later, on August 30, 2000, the Attorney General of Geneva issued a condemnation ruling against Kiritchenko, finding him guilty of money laundering (the "August 2000 Swiss court judgment"). As a part of Kiritchenko's penalty, the Attorney General required Kiritchenko to pay a fine of 1 million Swiss francs and ordered the transfer of certain assets held at Credit Suisse and SCS Alliance to Ukraine.[3] Specifically, the August 2000 Swiss court judgment ordered the transfer of assets deposited in the following accounts at SCS Alliance:

- 5317, held by Kiritchenko[4];

---

[3]    The condemnation ruling also transferred some assets to Geneva, specifically those held in account 5491 at SCS Alliance and those held in account 562.927 at Credit Suisse.

[4]    Somewhat confusingly, the August 2000 Swiss court judgment states that account 5317 was "apparently not used to receive or channel the benefits of any illicit activity by . . . Lazarenko or any other third party," see Appellant's App. at 2115, but then orders a portion of the deposits held at account 5317 to be transferred to Ukraine, see id. at 2118 (permitting the release of the seizure on account 5317 after the transfer to Ukraine of roughly $3.1 million held in the account). Apparently, just a portion of the funds in account 5317 were connected to the scheme.

- 14 -

- 5383, held by Bainfield;

- 5451, held by Wilnorth;

- 5452, held by GHP;

- 5482, held by Brancross; and

- 5522, held by Zeneta.

And it further ordered the transfer of assets deposited in the following accounts at Credit Suisse:

- 875.709.72, held by Paddox;

- 823.896.22, held by GHP; and

- 21383, held by Kiritchenko.

The fine of 1 million Swiss francs was to be paid from account 5484, held by an entity named May at SCS Alliance.

Nearly all the accounts listed in the August 2000 Swiss court judgment overlap with those identified and investigated by Switzerland as a part of its investigation. See supra Part I.A.2.ii. Only account 21383, held in the name of Kiritchenko at Credit Suisse, was not explicitly named in the June 1999 decision. Although the account was not explicitly named in the June 1999 decision, the decision indicates that the Swiss investigating judge had requested information for all accounts that "had been opened in the name[] of . . . Kiritchenko" and "ordered the seizure of [those] accounts."

### iv. Transfer of Swiss Assets to Ukraine

The two Swiss proceedings ultimately resulted in the transfer of roughly $15 million to Ukraine.[5] Those funds made their way to Ukraine in three tranches:

- Approximately 10.6 million Swiss francs ("tranche one") seized in connection with the June 2000 Swiss court judgment were transferred to UPGO's escrow account in October 2000. In March 2001, the funds were transferred to the Ukrainian treasury.

- Approximately $4,058,000 ("tranche two") seized in connection with the August 2000 Swiss court judgment were transferred to UPGO's escrow account in October 2000. In March 2009, the funds were transferred to the Ukrainian treasury.

- Approximately $1,744,980 ("tranche three") were transferred to the Ukrainian treasury in April 2002. The parties disagree as to whether Kiritchenko voluntarily returned this money or

---

[5] Technically, the returned funds sum to only about 12.3 million U.S. dollars because the 10.6 million Swiss francs returned in tranche one equated to roughly 6.5 million U.S. dollars at the time the June 2000 Swiss court judgment was issued. Throughout this litigation, however, the parties and the district court have referred to the returned funds as the $15 million in Swiss assets. For consistency, we will do the same.

returned it pursuant to the August 2000 Swiss court judgment.

### v. Blocking of Other Assets

The Swiss assets are not the only assets to have been blocked. The parties agree that nearly $270 million of assets connected to the money-laundering scheme have been blocked in Switzerland and beyond. But the Ukrainian defendants represent that only the above-mentioned Swiss assets have been returned to Ukraine.

### B. Procedural History

On November 26, 2010, UTICo[6] sued the Ukrainian defendants, alleging that the Ukrainian defendants breached their contractual duties under the May 1998 Agreement. UTICo also alleged that the Ukrainian defendants breached the 1999 California Assignment, were unjustly enriched, breached their fiduciary duties to UTICo, made misrepresentations to UTICo, and negligently failed to convey certain information to UTICo. It also asked the court to declare that: (1) UTICo is not subject to Ukrainian jurisdiction; (2) Ukrainian court decisions concerning UTICo would

---

[6] Foundation Honesty International, Inc. initially sued alongside UTICo. But following the Ukrainian defendants' motion to dismiss, the district court dismissed Foundation Honesty International, Inc. as a plaintiff. Universal Trading & Inv. Co. v. Bureau for Representing Ukrainian Ints. in Int'l & Foreign Cts. ("UTICo I"), 898 F. Supp. 2d 301, 326 (D. Mass. 2012).

not be recognized in Massachusetts; and (3) a power of attorney executed on April 30, 1999, was in effect until June 5, 2010, when the Supreme Court of the United States denied certiorari on a petition related to the California litigation, see Universal Trading & Inv. Co. v. Kiritchenko, 561 U.S. 1038 (2010) (mem.).

The Ukrainian defendants moved to dismiss the complaint in its entirety, arguing that (1) they were immune from suit; (2) Massachusetts was an improper venue for the suit; and (3) UTICo failed to state a claim for which relief could be granted.

The district court granted in part and denied in part the Ukrainian defendants' motion to dismiss. UTICo I, 898 F. Supp. 2d at 326. Specifically, the district court concluded that it could assert jurisdiction over UTICo's breach-of-contract claim relating to the May 1998 agreement under the commercial activity exception to the FSIA and that UTICo had adequately pled this claim. Id. at 316-17, 319-21. The court also determined that venue was proper in Massachusetts. Id. at 317-18. But the district court dismissed the majority of UTICo's other claims

because it found that each claim failed to state a claim for which relief could be granted.[7] See id. at 318-25.

The Ukrainian defendants appealed the district court's assertion of jurisdiction, and we affirmed. UTICo II, 727 F.3d at 12. Like the district court, we found that the commercial activity exception to the FSIA permitted the court to exercise jurisdiction over the May 1998 Agreement breach-of-contract claim, reasoning that the "asset recovery services . . . described in UTICo's complaint [were] exactly the sort for which private citizens contract," id. at 20, and that the May 1998 Agreement did "not impinge on Ukraine's sovereignty because [it] d[id] not . . . require [Ukraine] to reappropriate any assets into the Ukrainian treasury that [the] defendants decide[d] not to reappropriate," id. at 22.

Back in the district court, the parties engaged in limited discovery relating to the timeliness of UTICo's breach-of-contract claim. Both parties filed motions for summary judgment on the statute-of-limitations question. Following a

---

[7]    In addition to the breach-of-contract claim relating to the May 1998 Agreement, the district court permitted UTICo's request for a declaration of the duration of the April 30, 1999 power of attorney to proceed. UTICo I, 898 F. Supp. 2d at 326. But the district court's allowance of UTICo's request for declaratory relief was limited: the district court allowed it to proceed only insofar as the duration of the April 30, 1999 power of attorney might be implicated in resolution of the breach-of-contract claim. Id.

February 18, 2015 hearing on the cross-motions for summary judgment, the district court denied UTICo's motion.

On May 16, 2018, the district court held a second hearing on the Ukrainian defendants' motion for summary judgment. The district court ultimately denied the Ukrainian defendants' motion. But during the hearing, it also narrowed the scope of the claims before it. It determined that UTICo's claims for breach of contract became ripe only when the relevant assets were actually repatriated to Ukraine. And because only the roughly $15 million in assets connected to the June 2000 Swiss court judgment and the August 2000 Swiss court judgment (the "Swiss assets") had been repatriated to Ukraine, the district court limited UTICo's breach-of-contract claim in the case to the Swiss assets.

In the time between the two hearings, UTICo had moved to amend its complaint. The district court also addressed this motion at the May 16, 2018 hearing. It denied the motion, reasoning that to the extent UTICo was attempting to add allegations that the Ukrainian defendants breached the duty of good faith and fair dealing, UTICo had failed to meaningfully explain these theories of recovery. It also emphasized UTICo's delay in seeking to amend the complaint and how UTICo did not even attach a proposed amended complaint to its motion. See UTICo III, 605 F. Supp. 3d at 285.

After additional discovery, on February 8, 2019, the Ukrainian defendants moved for summary judgment a second time,

arguing that the remaining breach-of-contract claims were barred by the statute of limitations and that, in any event, the claims failed on the merits. In response, UTICo moved under Federal Rule of Civil Procedure 56(d) to conduct additional discovery, arguing that it lacked sufficient discovery to defend against the Ukrainian defendants' motion. While the Ukrainian defendants' motion for summary judgment and UTICo's Rule 56(d) motion remained pending, the parties also prepared for trial, filing proposed findings of fact, proposed conclusions of law, and trial memoranda. UTICo then belatedly moved to amend the complaint and cross-moved for partial summary judgment.

In a detailed decision issued on June 1, 2022, the district court granted the Ukrainian defendants' second motion for summary judgment, finding that UTICo's breach-of-contract claims connected to the two tranches of Swiss assets repatriated to Ukraine in 2001 and 2002 -- that is, tranches 1 and 3 -- were barred by the statute of limitations and that the remaining claim failed on the merits. UTICo III, 605 F. Supp. 3d at 280, 293, 299. The court also denied UTICo's other motions, reasoning that the Rule 56(d) motion simply sought to relitigate discovery disputes to no avail and that the motion to amend was both late and futile. Id. at 286-88.

On June 1, 2022, the district court entered judgment in favor of the Ukrainian defendants. This timely appeal followed.

## II. Discussion

On appeal, UTICo challenges each of the district court's rulings in the June 1, 2022 decision. UTICo also seeks review of the district court's determination that UTICo's breach-of-contract claim was ripe only as it related to the $15 million of Swiss assets that have been transferred to the Ukrainian treasury. Finally, UTICo argues that the district court abused its discretion by denying UTICo's three motions to amend. We address each argument in turn, beginning with UTICo's contention that the district court erred in limiting its breach-of-contract claim to those relating to the $15 million of Swiss assets.

### A. Non-Repatriated Assets

UTICo first takes issue with the district court's discarding of the portion of UTICo's breach-of-contract claim premised upon the $260 million of blocked assets that are unconnected to the two Swiss court judgments. But its grievances can be disposed of quickly because they stem primarily from a misunderstanding of what exactly occurred at the May 16, 2018 hearing.

UTICo misinterprets the nature of the district court's May 16, 2018 order and June 1, 2022 decision. UTICo asserts that, during the May 16, 2018 hearing, the district court did not dismiss the claims premised upon the $260 million of blocked assets not encompassed in the Swiss assets, but rather it bifurcated the trial

under Federal Rule of Civil Procedure 42(b).  Under the bifurcated trial, says UTICo, the parties would first try the case as it related to the $15 million in Swiss assets and then separately address the breach-of-contract claim relating to the remaining $260 million in blocked assets.  UTICo further contends that the district court then forgot about the bifurcation, thereby denying UTICo an opportunity to conduct discovery on the $260 million worth of assets and improperly expanding the scope of the Ukrainian defendants' second summary judgment motion to include all assets.

But the district court did no such thing.  At the May 16, 2018 hearing, the district court made no mention of Rule 42(b).  Rather, it noted that UTICo's breach-of-contract claim was not ripe insofar as it was based on non-repatriated assets and therefore dismissed the claims relating to the blocked -- but not yet repatriated -- $260 million.  See Appellant Addendum at 45 ("At this point only the Swiss assets are litigable.").  In doing so, the district court made clear that it was not deciding the merits of UTICo's breach-of-contract claims as to those assets.[8]

---

[8] The Ukrainian defendants also appeared to understand that UTICo was not foreclosed from bringing an action in the future based on the blocked, but not yet repatriated, assets should those assets someday be repatriated.  See Transcript of Motion Hearing at 29-30, Dist. Ct. Docket Item 168 (counsel for the Ukrainian defendants acknowledging the court's "point" concerning future repatriation and recognizing that "[d]own the line[,] who knows what happens [regarding an action] if assets are repatriated in the future?").

<u>See</u> Transcript of Motion Hearing at 39-40, Dist. Ct. Docket Item 168 (noting that the court was not granting "judgment on the merits" on the non-Swiss assets). In other words, it left open the possibility for UTICo to bring a new lawsuit if those assets are someday repatriated.

On appeal, UTICo does not otherwise dispute the district court's ruling that its breach-of-contract claims relating to the non-repatriated assets are not ripe. In fact, its statute-of-limitations arguments are premised on repatriation being defined as the point at which a breach-of-contract claim ripens.

Instead, UTICo attempts to circumvent the ripeness issue by asserting a different theory as to the non-repatriated assets: breach of the implied covenant of good faith and fair dealing. But that theory is notably absent from UTICo's initial complaint, and, for reasons explained <u>infra</u>, the district court did not abuse its discretion in denying UTICo's subsequent requests to amend the complaint to add a claim of breach of the implied covenant of good faith and fair dealing based on the Ukrainian defendants' alleged failure to repatriate assets.

UTICo's arguments that the district court improperly dismissed and denied UTICo discovery on its breach-of-contract claim relating to the $260 million non-repatriated assets thus are without merit. Indeed, its underlying assumption that the district

court granted summary judgment on the merits of this claim is incorrect. We therefore affirm the district court's dismissal of the portion of UTICo's breach-of-contract claim relating to the non-repatriated assets as unripe.

## B. Swiss Assets

UTICo next challenges the district court's determination that the Ukrainian defendants were entitled to summary judgment on the portion of UTICo's breach-of-contract claim related to the Swiss assets that have been transferred to the Ukrainian treasury. It argues that the district court erred in finding that the statute of limitations barred UTICo's claims connected to tranches one and three and that equitable tolling was not warranted. UTICo also argues that it has raised a genuine issue as to whether it assisted the Ukrainian defendants in recovering the three tranches.[9]

---

[9] UTICo additionally contends that the district court erred in dividing the assets at issue in this litigation for purposes of determining accrual into the "Swiss assets" and other non-repatriated assets. In pressing this contention, UTICo argues that the contract does not contemplate divisibility but instead contemplates that the "worldwide assets," with respect to which UTICo's services were contracted, are to be treated as a "whole." The upshot of this contention, it seems, is that any claim to a commission owed on the Swiss assets, so defined, is also unripe insofar as the whole package of assets contemplated by the parties' contract has not been repatriated. And accordingly, there is no basis for the district court to have passed on the statute of limitations and merits questions with respect to any claims based on the Swiss assets. However, aside from asserting that there is no basis on the face of the contract for concluding that the contract is divisible, UTICo fails to develop any argument that the district court erred in its application of Massachusetts law when it concluded that the contract was divisible for

- 25 -

We review a district court's grant of summary judgment de novo. Potvin v. Speedway LLC, 891 F.3d 410, 413-14 (1st Cir. 2018); see Barraford v. T & N Ltd., 778 F.3d 258, 263 (1st Cir. 2015) (review of grant of summary judgment on statute-of-limitations grounds is de novo). "We will affirm the entry of summary judgment if -- and only if -- the facts," as viewed in the light most favorable to the nonmovant, "show beyond any legitimate question the movant's entitlement to judgment as a matter of law." Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007); see Fed. R. Civ. P. 56(a). Although we must draw all reasonable inferences in the light most favorable to the nonmovant, we are not obligated "to draw unreasonable inferences or credit bald assertions, empty conclusions, [or] rank conjecture." Cabán Hernández, 486 F.3d at 8 (emphasis omitted).

## 1. Statute of Limitations

The parties agree that the relevant statute of limitations is six years and that UTICo's cause of action began to accrue when the assets were returned to Ukraine. On appeal, the parties also agree that assets are not "returned" until they are

statute-of-limitations purposes. We therefore fail to see any error in the district court's ruling.

- 26 -

transferred into the Ukrainian treasury; mere transfer to UPGO's escrow account is not enough.[10]

UTICo commenced this action on November 26, 2010. Thus, unless tolling is warranted, any cause of action that accrued before November 26, 2004, is barred by the statute of limitations. Tranches one and three were transferred to the Ukrainian treasury in March 2001 and April 2002, respectively, and therefore, unless tolling is appropriate, any claims relating to these tranches are time-barred. The district court concluded tolling was not warranted because the return of funds to Ukraine was not inherently unknowable, the Ukrainian defendants did not have an affirmative duty to disclose to UTICo the return of funds to the Ukrainian treasury, and the Ukrainian defendants did not intentionally

---

[10] Before the district court, the Ukrainian defendants argued that the assets were "returned" once transferred to UPGO's escrow account. See UTICo III, 605 F. Supp. 3d at 291. The district court concluded that no reasonable factfinder could agree with the Ukrainian defendants' interpretation of the contract and that assets were not "returned" until they were transferred to the Ukrainian treasury. Id. at 292-93. On appeal, the Ukrainian defendants have not argued that the district court erred in concluding that the assets needed to be transferred to the Ukrainian treasury for them to qualify as "returned."

Nevertheless, on appeal, UTICo rehashes its argument that assets are not "returned" until they reach the Ukrainian treasury, and, at various points, chastises the district court for finding that a cause of action accrues when assets are merely blocked. These arguments are puzzling, to say the least, as the district court found that a cause of action does not accrue until the funds reach the Ukrainian treasury, see id., and the Ukrainian defendants do not dispute this point on appeal.

deceive or conceal the fact that tranches one and three had been returned.  See UTICo III, 605 F. Supp. 3d at 293-95.

On appeal, UTICo makes much of the fact that it presented evidence showing that it typically takes five to seven years to recover expatriated assets once they are blocked.  It accuses the district court of overlooking UTICo's expert affidavits to that effect in determining that the statute of limitations had run on tranches one and three.

UTICo's arguments about the precise impact these affidavits should have on the statute of limitations are not the model of clarity.  To the extent that UTICo is arguing that the statute of limitations should automatically be tolled by five to seven years, its argument misses the mark.  As the district court aptly noted, that the typical asset recovery period is five-to-seven years "does not change the fact that tranche [one] and tranche [three] were actually adjudicated and returned to the Ukrainian [t]reasury by 2003," and thus, the actions premised on tranches one and three accrued more than six years before the commencement of this litigation.  UTICo III, 605 F. Supp. 3d at 293.

UTICo next argues that it should be permitted to seek recourse under the discovery rule.  The discovery rule permits tolling of the statute of limitations "until a prospective plaintiff learns or should have learned that [it] has been injured

. . . in three circumstances: where a misrepresentation concerns a fact that was 'inherently unknowable' to the injured party, where a wrongdoer breached some duty of disclosure, or where a wrongdoer concealed the existence of a cause of action through some affirmative act done with the intent to deceive." Patsos v. First Albany Corp., 741 N.E.2d 841, 846 (Mass. 2001).

UTICo claims that the statute of limitations should have been tolled for two separate reasons: (1) the fact of repatriation was "inherently unknowable" and (2) the Ukrainian defendants fraudulently concealed the transfer of tranches one and three to the Ukrainian treasury. To the extent that UTICo again falls back on its expert affidavits to argue that a reasonable person would not have asked about the recovery of funds until five to seven years after assets were blocked, we are unconvinced. A reasonable juror could not sign onto that line of logic in light of the evidence that several news organizations had reported on interactions between Swiss authorities and UPGO. Moreover, as the district court noted, UTICo was in regular communication with UPGO and could have asked UPGO whether Ukraine had fully repatriated the assets from the accounts implicated in the June 2000 Swiss court judgment and August 2000 Swiss court judgment. See UTICo III, 605 F. Supp. 3d at 294. Although UTICo contests the accuracy of the news articles and suggests they referred to the transfer of funds to UPGO's escrow account rather than the Ukrainian treasury,

those stories, at a minimum, put UTICo on notice that it should have been asking the Ukrainian defendants about the repatriation of the specific Swiss accounts implicated in tranches one and three if it truly thought it had a claim to a commission on those returned funds.

UTICo asserts it did just that, but that UPGO denied any recovery of Swiss assets. Therefore, UTICo argues, a reasonable juror could find that UPGO concealed the repatriation of tranches one and three. To demonstrate a genuine issue of fact as to whether the Ukrainian defendants concealed the transfer of tranches one and three to the Ukrainian treasury, UTICo relies on Lambert's affidavit and his 2019 deposition.

The Lambert affidavit and 2019 deposition suggest that UTICo asked representatives of UPGO whether any assets had been returned to the Ukrainian treasury. For example, Lambert attests that at meetings in 2003 with representatives of UPGO, he inquired about the recovery of frozen assets, including those from Switzerland, and that UPGO representatives denied that any assets had been repatriated. During his 2019 Rule 30(b)(6) deposition on behalf of UTICo, Lambert similarly stated that at the 2003 and 2004 meetings, UTICo "raised the question about the recovery of the various accounts. [UTICo] went through various jurisdictions. And it was never disclosed to [UTICo] that any assets had been actually repatriated, in terms that the Ukrainian treasury

obtained those funds."  Relying on this evidence, UTICo contends that the district court erred in concluding that "there is no cognizable fraudulent concealment to be found in the record" and thereby granting summary judgment for the Ukrainian defendants on statute-of-limitations grounds.

Under Massachusetts law, the rule governing equitable tolling of a statute of limitations because of fraudulent concealment is codified at Massachusetts General Laws ch. 260 § 12. The Supreme Judicial Court of Massachusetts has held that, in the absence of a fiduciary relationship, the statute of limitations may be tolled because of fraudulent concealment only "if the wrongdoer . . . concealed the existence of a cause of action through some affirmative act done with intent to deceive." Epstein v. C.R. Bard, Inc., 460 F.3d 183, 189 (1st Cir. 2006) (quoting Puritan Med. Ctr., Inc. v. Cashman, 596 N.E.2d 1004, 1010 (Mass. 1992) (citation and internal quotation marks omitted)); see Abdallah v. Bain Capital LLC, 752 F.3d 114, 119-20 (1st Cir. 2014). In challenging the district court's ruling that there was no factual basis in the record from which a reasonable factfinder could "conclude that Ukraine intentionally concealed any cause of action," UTICo has failed to develop any argument or cite any case law in support of the proposition that Lambert's statements in his affidavit and 2019 deposition in and of themselves suffice to permit a reasonable juror to find that the Ukrainian

- 31 -

defendants -- through the representations of the UPGO's representatives -- acted with an intent to deceive UTICo. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Whether Lambert's attestations create a genuine issue of material fact as to whether the repatriation of tranche three was unknowable or concealed by the Ukrainian defendants is a closer question. But we need not wade any further and decide whether UTICo has created a genuine issue of fact as to the timeliness of this claim because, as we next explain, the breach-of-contract claim relating to tranche three fails on the merits.

## 2. Recovery of Tranches Two and Three

We turn now to the district court's ruling that the Ukrainian defendants were entitled to summary judgment on the merits of UTICo's breach-of-contract claim relating to tranche two. The district court concluded that UTICo has not demonstrated a genuine issue of fact as to whether it was helpful in the recovery of the accounts listed in the August 2000 Swiss court judgment which comprise tranche two. UTICo III, 605 F. Supp. 3d at 298-99. Tranche three, like tranche two, implicates the August 2000 Swiss court judgment. Thus, we find that the district court's analysis on the merits of the breach-of-contract claim relating to tranche two applies equally to the claim relating to tranche three.

As the district court explained, a reasonable juror certainly could find that UTICo assisted the Ukrainian defendants in locating and blocking assets. See id. at 296-98. But the question before us is not merely whether UTICo assisted the Ukrainian defendants in a broad sense. To defeat the Ukrainian defendants' motion for summary judgment, UTICo had to show that a reasonable juror could infer that the $4.058 million returned to Ukraine in tranche two and the $1.744 million in tranche three were returned to Ukraine "in connection with" the powers of attorney executed by UPGO. Like the district court, for purposes of considering the Ukrainian defendants' motion for summary judgment, we will adopt UTICo's definition of "in connection with" and ask whether UTICo was "helpful" in recovering the assets. See UTICo III, 605 F. Supp. 3d at 295-96. The precise question before us therefore is whether a reasonable juror could infer that UTICo's work under the powers of attorney was helpful in recovering the assets returned pursuant to the August 2000 Swiss court judgment. We agree with the district court that a reasonable juror could not.

UTICo argues that summary judgment should not have been granted to the Ukrainian defendants on the merits because it has raised a genuine issue of fact as to whether it was helpful in recovering tranches two and three. The Ukrainian defendants respond that there is no genuine issue of material fact as to

UTICo's helpfulness in the recovery of tranches two and three because the record establishes that the Swiss authorities recovered these assets without meaningful help from UTICo.

Before diving deeper into UTICo's arguments on appeal, we find it useful to pause and lay out the summary judgment standard in more detail. Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment "bears the initial burden of showing that no genuine issue of material fact exists." Feliciano-Muñoz v. Rebarber-Ocasio, 970 F.3d 53, 62 (1st Cir. 2020). If the moving party meets this burden, the nonmovant must then put forth specific facts to establish the existence of a genuine dispute of material fact. See Pleasantdale Condos., LLC, 37 F.4th at 733. And "[o]n issues where the nonmovant bears the ultimate burden of proof," id. (citation omitted), "conclusory allegations, improbable inferences, and unsupported speculation" will not suffice, Balser v. Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers (IUE) Loc. 201, 661 F.3d 109, 118 (1st Cir. 2011) (citation omitted). Instead, the nonmovant must come forth with "definite, competent evidence to rebut the motion for summary judgment." Pleasantdale Condos., LLC, 37 F.4th at 733 (citation and internal quotation marks omitted).

As an initial matter, UTICo's argument on appeal largely boils down to: (1) we recovered hundreds of documents; (2) we sent these to UPGO at some point; (3) UPGO shared the documents with the Swiss authorities; and (4) therefore, we must have been helpful to Ukraine in its efforts to recover the Swiss assets mentioned in the August 2000 Swiss court judgment. But UTICo does little to connect the dots and explain how it knows that the documents made their way to Switzerland and why the documents would have been critical to the Swiss authorities succeeding in their prosecution of Kiritchenko.

UTICo's effusiveness and lack of developed argumentation before us and the district court may well mean its argument that it assisted in the recovery of tranches two and three is waived. See Zannino, 895 F.2d at 17 ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."); Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988) ("Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (citation and internal quotation marks omitted)). The district court should not be expected "to ferret out . . . evanescent needle[s] from . . . outsized paper haystack[s]." Rivera-Gomez, 843 F.2d at 635. Nonetheless, the district court patiently waded

through UTICo's submissions, paying particular attention to the Lambert affidavit and the exhibits referenced in it. After its careful review, it concluded the Ukrainian defendants were entitled to summary judgment.

This court also has reviewed UTICo's submissions and has reached the same conclusion: UTICo has failed to show that a reasonable juror could conclude that UTICo's work in connection with the May 1998 Agreement and related powers of attorney helped Ukraine recover the Swiss assets in tranches two and three.

A quick recap of the Swiss authorities' knowledge at the time UTICo and Ukraine entered the May 1998 agreement demonstrates why UTICo's arguments on appeal lack merit. As previously mentioned, by the time May 15, 1998, rolled around, the Swiss authorities already knew the names of several companies associated with Kiritchenko, had identified accounts related to the companies at Credit Suisse and SCS Alliance, and had some awareness of the connection between those accounts and Kiritchenko's money-laundering scheme. The names of those companies and accounts later would reappear in the August 2000 Swiss court judgment. In addition, in the months leading up to the May 1998 Agreement, the Swiss investigating judge exchanged information with Ukraine and requested information regarding Kiritchenko and his companies'

accounts from banks within its jurisdiction.[11]  What is more, the information obtained by Switzerland was apparently not insubstantial as it was enough to result in the seizure and compulsory administration of the bulk of the accounts that later were named in the August 2000 Swiss court judgment.

UTICo is correct that it would be an additional two years before Kiritchenko would plead guilty to the Swiss charges.  But its suggestion that UTICo was the one to tip the scales and secure Kiritchenko's plea with the evidence it gathered and the threat of its California litigation amounts to little more than conjecture that cannot defeat summary judgment.  See Pleasantdale Condos., LLC, 37 F.4th at 733 ("Evidence that is conjectural or problematic will not suffice to forestall summary judgment." (citation and internal quotation marks omitted)); Cabán Hernández, 486 F.3d at 8 (emphasizing that on summary judgment we do not have "to draw unreasonable inferences or credit bald assertions, empty conclusions, [or] rank conjecture").

There are a few problems with UTICo's suggestion that it provided evidence that helped Ukraine recover the assets and caused

---

[11]    We note that this information exchange was not a one-way street.  The Swiss investigating judge also shared information with the Ukrainian authorities.  For example, at a March 27, 1998 meeting, the Swiss investigating judge alerted a Ukrainian investigating judge to the names of several accounts and entities for which Kiritchenko was the beneficiary but that Ukraine had failed to mention in its requests to Switzerland.

Kiritchenko to plead to the Swiss charges. First, although UTICo establishes that it sent hundreds of pages of documents to UPGO, it is unclear exactly what they sent to UPGO and when. Although the powers of attorney are dated, the hundreds of pages of documents lack dates, and Lambert's affidavit does not fill that gap.

Similarly, UTICo has not put forth evidence establishing that these documents were crucial to the Swiss authorities in securing the August 2000 Swiss court judgment or Kiritchenko's plea. Although it asserts that its expert declarations explain the importance of certain documents -- in particular, the recovery of Kiritchenko's passport -- to proving up a money-laundering charge, we have reviewed its expert declaration and found nothing to that effect. Indeed, UTICo's experts say little about the specific types of evidence needed to secure the return of expatriated assets after a money-laundering conviction. Instead, UTICo's experts opine about the length of the typical asset recovery cycle, the documents related to asset recovery that UTICo believes the Ukrainian government possesses, the veracity of documents relating to the California litigation, and the interpretation and translation of UTICo's agreements with UPGO. None of these things bear on the importance of the documents UTICo sent to UPGO to send to the Swiss.

This once again forces UTICo to rely on Lambert's statements to fill the gap. But neither his affidavit nor his 2019 deposition testimony rises to the occasion. As the district court noted, UTICo's argument that it assisted in the recovery of the Swiss assets suffers from issues of "vagueness" and is often "conclusory." UTICo III, 605 F. Supp. 3d at 296, 298. Lambert's affidavit and 2019 deposition suffer from these same defects. Although Lambert's affidavit and deposition testimony recount the entities about which UTICo gathered evidence and the evidence recovered, they fail to include specific details from which one might infer how that evidence landed in Switzerland's hands, how it was crucial to obtaining the August 2000 Swiss court judgment, and why Switzerland could not obtain this information during its own investigation.[12]

Finally, UTICo's suggestion that its evidence and parallel litigation in California caused Kiritchenko to plea and provide the information to get Swiss recovery over the finish line overlooks the additional evidence obtained by Switzerland during

---

[12] At times, UTICo's reply brief suggests that without UTICo, the Swiss authorities would not have known of the companies and accounts implicated in the money-laundering scheme. But this assertion is at odds with the non-speculative evidence establishing that the Swiss authorities knew of the relevant accounts and companies before the May 1998 Agreement's execution. What is more, such a contention cannot be taken seriously where Lambert, in his 2019 deposition testimony, acknowledged that the Swiss authorities knew of the existence of these companies.

its investigation. In particular, the Swiss investigating judge deposed Kiritchenko and Lazarenko. In his deposition, Lazarenko offered the Swiss authorities details on the money-laundering scheme and the entities implicated in it. And, in June 2000, two months before the August 2000 Swiss court judgment against Kiritchenko, Lazarenko pled guilty to the offenses against him, including the factual details underlying his offenses.

UTICo's strongest support for its assertion that UPGO forwarded helpful documents from UTICo to Switzerland are two December 12, 1998 letters from UPGO to the Swiss investigating judge. The two letters indicate that UPGO sent several volumes of documents to Switzerland that included, among other things, the following: (1) "[d]ocumentation on transfers of funds from the accounts of [United Energy International Ltd.] . . . to the accounts of various firms in Swiss banks"; (2) "[c]opies of the documents on the owners and principals of [Bainfield, Paddox, and Bassington]"; and (3) information concerning Somolli. Even so, it remains unclear what information UTICo transmitted to Ukraine, whether those mailings both pre-date the December 12, 1998 letters and post-date the May 1998 agreement, and why the transmitted information was crucial to the success of the Swiss investigation. Without those details, we are left only to speculate on the usefulness of the information and whether it was forwarded to Switzerland. And speculation and surmise cannot carry the day at

the summary-judgment stage. See Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 398 (1st Cir. 2012) ("Assumptions are not a substitute for evidence," we will not "pile[] inference upon inference" at the summary-judgment stage in a manner that "elevates assumption over proof."); Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997) ("[E]stablishing a genuine issue of material fact requires more than effusive rhetoric and optimistic surmise."). Nor can "'[t]he mere existence of a scintilla of evidence' in favor of the nonmoving party . . . defeat summary judgment." Barreto-Rosa v. Varona-Mendez, 470 F.3d 42, 45 (1st Cir. 2006) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

Accordingly, we agree with the district court that the Ukrainian defendants are entitled to summary judgment on the portion of UTICo's breach-of-contract claim related to the Swiss assets that have been transferred to the Ukrainian treasury.

### C. Motions to Amend

Finally, UTICo takes issue with the district court's denial of UTICo's three motions to amend.

"We review a district court's denial of a motion to amend for abuse of discretion." Mulder v. Kohl's Dep't Stores, Inc., 865 F.3d 17, 20 (1st Cir. 2017). Federal Rule of Civil Procedure 15(a) instructs that leave to amend be "freely give[n] when justice so requires." Fed. R. Civ. P. 15(a)(2). "But this does not mean

- 41 -

. . . that a trial court must mindlessly grant every request for leave to amend." Nikitine v. Wilmington Tr. Co., 715 F.3d 388, 390 (1st Cir. 2013) (omission in original) (citation and internal quotation marks omitted). Indeed, "a district court may deny leave to amend when the request is characterized by undue delay, bad faith, futility, [or] the absence of due diligence on the movant's part." Id. (alteration in original) (citation and internal quotation marks omitted). And where "the record evinces an arguably adequate basis for the [district] court's decision," we will affirm the denial of a motion to amend. Hatch v. Dep't for Child., Youth & Their Fams., 274 F.3d 12, 19 (1st Cir. 2001).

We quickly dispose of UTICo's appeal of the denials of the first and second motions to amend. In its first motion to amend, UTICo sought leave to add an unfair and deceptive trade practices claim under Massachusetts General Laws ch. 93A. The district court denied this motion without prejudice to UTICo refiling the motion after this court resolved the Ukrainian defendants' interlocutory appeal. Certainly, we see no abuse in the district court's decision to defer consideration of the motion to amend until our resolution of an appeal that may have dispensed of the case in full. UTICo remained free to refile its motion to amend after we affirmed the district court's exercise of jurisdiction over the breach-of-contract claims and mandate issued on September 4, 2013.

For some reason, UTICo never refiled its first motion to amend. Instead, UTICo waited over a year to file its second motion to amend. That motion made no mention of an unfair and deceptive trade practices claim. The precise amendments that UTICo sought to make were less than clear. At a minimum, it appears UTICo sought to add additional factual allegations it believed related to the tolling of the statute of limitations. During the May 16, 2018 hearing, UTICo also suggested that it sought to amend the complaint to add a claim that the Ukrainian defendants breached the implied covenant of good faith and fair dealing, but the motion itself makes no mention of a good faith and fair dealing claim. At the conclusion of that hearing, the district court denied UTICo's second motion to amend because it was not "well-founded" and because the amendments that UTICo sought to make did not relate to the remaining breach-of-contract claims.[13]

---

[13] The district court also emphasized that UTICo had failed to include a proposed amended complaint with its motion to amend. See UTICo III, 605 F. Supp. 3d at 285. On appeal, UTICo makes much of the fact that the Local Rules for the District of Massachusetts do not require a party to attach a copy of its proposed pleading to a motion to amend. UTICo is correct that neither Local Rule 15.1 nor Rule 15 require a proposed pleading, but the point still stands that a party must set forth some basis on which the district court can distill how and why a party seeks to amend a complaint -- whether that be done in the motion to amend or in a proposed complaint attached to the motion. UTICo failed to do so, particularly with respect to its claim that the Ukrainian defendants breached the implied covenant of good faith and fair dealing.

Again, we see no abuse of discretion in the district court's denial of the second motion to amend. The proposed amendments included in UTICo's motion did not relate to the Swiss assets -- the only claim remaining after the May 16, 2018 hearing. Nor did the proposed amendments relate to the reasoning on which the district court predicated its decision to limit the breach-of-contract claim to the repatriated Swiss assets. Instead, the proposed amendments merely identified funds which had yet to be repatriated and attempted to buttress UTICo's already dismissed claims that related to the California litigation.

Finally, we turn to the denial of UTICo's third motion to amend. UTICo moved to amend the complaint a third time late in this litigation. It sought to add several claims to the complaint, including claims for fraudulent concealment, breach of the implied covenant of good faith and fair dealing, and misrepresentation. The district court denied the motion to amend both because of undue delay and because UTICo's proposed amendments would have been futile. See UTICo III, 605 F. Supp. 3d at 286-87.

The district court acted within its discretion in denying the third motion to amend based on undue delay. By the time UTICo filed its third motion to amend, discovery had closed, the deadline for summary judgment motions had passed, and the Ukrainian defendants' second motion for summary judgment was pending before the court. In addition, over a year had passed

since the district court denied UTICo's second motion to amend for, among other reasons, its failure to meaningfully articulate a claim based on a theory of breach of the implied covenant of good faith and fair dealing.  We have upheld the denial of motions to amend for undue delay based on even shorter time frames at earlier stages of the litigation.  See, e.g., Calderón-Serra v. Wilmington Tr. Co., 715 F.3d 14, 20 (1st Cir. 2013) (affirming denial of motion to amend "filed . . . nearly a year after the commencement of the action and many months after the . . . motions to dismiss had been taken under advisement"); Villanueva v. United States, 662 F.3d 124, 127 (1st Cir. 2011) (per curiam) (affirming denial based on undue delay when plaintiff was aware of facts underlying proposed claim before filing suit yet waited four months to request to amend); Kay v. N.H. Dem. Party, 821 F.2d 31, 34 (1st Cir. 1987) (per curiam) (affirming a finding of undue delay when plaintiff moved to amend three months after granting of motion to dismiss relevant claims).

UTICo contends that its delay in filing the third motion to amend should not be held against it where the district court took nearly three years to rule on the motion and previously took over three years to rule on the second motion to amend.  But UTICo's frustration about the pace of this litigation misses the point.  For various reasons, the pace of this case's proceedings may have been slow.  Nevertheless, UTICo still had ample time to

seek leave to amend for a third time to try and remedy the flaws in its second motion to amend.

It also is unclear why UTICo could not have requested leave to make the amendments set forth in its third motion to amend at an earlier stage of the litigation. Although UTICo asserts in a conclusory manner that its proposed amendments were "based on new evidence and facts showing UTICo's assistance in the recovery by [the d]efendants of the assets in Switzerland and elsewhere," it does not explain why it had to wait until four months after the close of discovery to add these allegations and why it could not discover those facts earlier. Nor does it make any effort to explain what the "new evidence and facts" are and why they are critical. What is more, it does not appear that the proposed amendments actually further elucidate UTICo's assistance in recovery of the $15 million of Swiss assets. Indeed, at oral argument, UTICo conceded that its proposed amendments to the complaint did not affect the claims remaining at that point, that is, the breach-of-contract claims relating to the $15 million in Swiss assets, but rather focused on pleading additional claims. Given the delay in moving to amend for the third time and the lack of explanation for why UTICo failed to propose these amendments earlier, we conclude that the district court did not abuse its

discretion in denying the third motion to amend.[14] See Calderón-Serra, 715 F.3d at 20 ("Appreciable delay alone, in the absence of good reason for it, is enough to justify denying a motion for leave to amend.").

## III. Conclusion

For the reasons stated above, we affirm the district court's dismissal of UTICo's breach-of-contract claim insofar as it relates to blocked but not yet repatriated assets, its grant of summary judgment to the Ukrainian defendants on UTICo's breach-of-contract claim related to the Swiss assets, and its denial of UTICo's three motions to amend.

---

[14] Because the district court did not abuse its discretion in denying the third motion to amend for undue delay, we need not pass judgment on whether the proposed amendments would have been futile. It does appear that many of UTICo's proposed amendments, such as its claims related to the California assignment and fraudulent concealment claim, are futile. But we pause to make clear that we decline to address the futility of UTICo's claim for breach of the implied covenant of good faith and fair dealing today. The district court concluded that although our decision in UTICo II approved of the exercise of jurisdiction over UTICo's breach-of-contract claims, its reasoning foreclosed the exercise of jurisdiction over a claim for breach of the implied covenant of good faith and fair dealing that rested on the theory that Ukraine has failed to repatriate assets. UTICo III, 605 F. Supp. 3d at 286-87. That may well be the case, but we find it best to leave this question of foreign sovereign immunity for another day.